Shearer, J.
I. Municipal corporations derive their powers from the statutes passed by the general assembly, in which all legislative power is vested by the constitution. That body may delegate to cities and villages the power to make by-laws and ordinances, which, when authorized, have the force, in favor of the" unicipality, and against those bound thereby, of laws passed by the legislature, n ordinance which does not fall within the grant of power, express or necesarily implied, is void.
In determining the existence of such power all substantial doubts are to e resolved against the corporation and in favor of the general public. Horr, Pol. Ord., sec. 17. The converse is the rule in respect to statutes passed by he general assembly.
' The distinction rests upon sound reason. The authority to legislate having een vested in the general assembly by the constitution is absolute; and there an be no limitation upon it by inference or implication. But the contrary is he fact as to municipal corporations; and all authority being simply delegated, heir powers must be kep.t strictly within their delegated authority. With these ules in view we now inquire whether the ordiñance in question falls within he grant of power contained in the statute prescribing the power of municipal orporations? If such power exists, it is in virtue of the provisions of sec. *140 1692, Rev. Stat., which declares, among other things, that, “in addition to the powers specifically granted in this title, and subject to the exceptions and limitations contained in other parts of it, cities and villages shall have the general powers enumerated in this section, and the council may provide by ordinance for the exercise and enforcement of the same.
1. To prevent riots, gambling, noise and disturbance, and indecent or disorderly assemblages, and preserve the peace and good order, and protect the property of the municipal corporation and its inhabitants.
^ i}í íjí
3. To prevent injury or annoyance from anything.dangerous, offensive or unwholesome, and to cause any nuisance to be abated.
It is claimed in support of the ordinance that it is within the police powers of the corporation. On the ‘other hand it is argued that all police .power resides in the state; and that municipalities possess no such powers, save those enumerated in the grant, and necessarily incident thereto. That all others are impliedly excluded; and that no such grant is expressed or can be inferred from the statute.
It seems clear that there is no express power — that is, the power to regulate or prohibit the use of steam whistles is not in terms conferred upon the city. If it exists it must be included in the power “to prevent noise,” mentioned in the first subdivision of the section, or in the power to “preserve the peace and good order” * * * of the * * * corporation * * * . Or the whistle must be a nuisance to be abated 'under the authority granted in the third sub division.
This involves a construction of these subdivisions. What-is included in the word “noise” as used in the section? “Noise” is a general term; and where, in a grant of power, the enumeration of specific rights is followed'by some expression of general import, the latter extends'the enumeration only to include things ejusdem generis as those specifically named. Horr. Pol. Ord., sec. 30. Thus a power to license hacks, drays and other vehicles, would authorize the imposition of a license on all kinds of hacks and drays, but not on vehicles used for other purposes. Idem.
So under the provisions of sec. 6 of the Mechanic’s Lien law (S. & C., 864), that, if by collusion, or otherwise, the owner of the building shall pay the contractor in advance of the sum due on the contract, he shall 'be liable for losses of those supplying work and material, the general word “otherwise” was construed as applicable ejusdem generis, and that the mode of overpayment must be -similar to payment by collusion in order to render the owner liable.
So also Mr. Broome, in his work on Legal Maxims, page 570, says: “In the construction of statutes the rule noscitur a sociis is very-frequently applied, the meaning of a word, and consequently, the intention of the legislature, being ascertained by reference to the context, and considering whether the word in question and the surrounding words are in fact, ejusdem generis, and referable to the subject-matter.” " .
Again, the statute 39 Car., 3, provided, “that no tradesman,- artificer, workman, laborer, or other person whatsoever” should exercise his ordinary calling on the Lord’s day. Thereupon the words “other person” were held not to include a farmer, who is not a person of like denomination with those specifically mentioned; for, as Bayley, J., said, “if all persons were meant there was no need of specific enumeration.” Again, the words of another statute were “wherry, lighter, or other craft.” And the term “craft” was held not to include a steam tug; because though a steam tug is a craft, it is not of the same character as a wherry or lighter. See Bishop on Written Law, secs. 345-6.
Of the words “Artificers, calico printers, handicraftsmen, miners, colliers, pitmen, potters, laborers and others,” in the statute of 6 Geo. 3, c. 35, for the better regulating of apprentices and persons working under contract, Lord Den-man said: “Large as these Words undoubtedly are, or other persons who shall *141 contract with any person whomsoever; 'when we apply them to the ordinary rules for construing acts of parliament laid down by Dwarris on Statutes . . and acted upon at all times, we feel compelled to say, that the “other persons” are not all persons whomsoever, who enter into engagements to serve for stated periods, but persons only of the same description as those before enumerated.” Kitchen v. Shaw, 6 Ad. & El., 729; see also People v. Rochester, 44 Hun., 166; 13 Oregon, 589; Shultz v. Cambridge, 38 O. S., 659; Lane v. State, 39 O. S., 312.
It is claimed, however, that the canons of interpretation just quoted, do not aid in ascertaining the legislative intent, because under no fair construction can the word “gambling” and “noise” be held to be ejusdem generis. There is force in the contention. But it is dissipated when we refer to the law as it stood before the revision. Prior to the revision the word “gambling” was not a part of the first subdivision, — it had place in another clause or subdivision of the statute.
Where statutes are revised to render them more convenient and plain, the revision is to receive the same interpretation as the old law, unless the contrary intention affirmatively appears. State v. Jackson, 36 O. S., 281-286.
No construction has been given to these words by our supreme court. But testing the section as it formerly stood by the rules stated, we cannot escape the conviction that the word “noise,” as used therein, is ejusdem generis with “riot” and “disorderly conduct.” And we do not think there is any reason to suppose that the legislature intended to enlarge the meaning of these words by the transposition of the word “gambling.” The same construction is to be given to the phrase “peace and good order.” These words are correlatives or antitheses of “noise” and “disturbance.” The council may prevent the one by preserving the other. Peaqe and good order, as used in the statute, consist in the absence of riot, noise and disturbance, as therein intended.
II. Did the sounding of the whistle constitute a nuisance ?
That which works injury or annoyance to another is, in general, a nuisance. The nuisance referred to in the statute is that which arises from something dangerous, offensive or unwholesome. It is not sufficient, however, that.it should annoy or injure a single individual, or a small number of persons as compared with the entire community. Such might be a private nuisance; but with that the corporation has nothing to do. Its jurisdiction is restricted to public nuisances. Such a nuisance is one that produces common injury and damage to the public, so that one person cannot be said to sustain any special or particular damage, apart from the.rest of the community. Wood on Nuisance, sec. 29.
Upon an indictment against a tinsmith for the noise made by him in carrying on His trade, it appeared that the noise only affected the inhabitants of three' numbers of the chambers of Clifford's Inn. It was held by Lord Ellenborough, C. J., that the indictment could not be sustained, as the annoyance at most was but a private nuisance. Id.
In the light of these rules it cannot be said that this octave or toboggan whistle was a public nuisance. Whether it was a private nuisance is not for us to decide. In such case the party aggrieved has a remedy; but the public has nothing to do with affording redress.
As we have seen, this whistle annoyed but a single individual. She was an invalid residing a great distance from the shop where the whistle was located. The public- — the community — were, in the main, indifferent to the sound. Some enjoyed it, some did not; others cared nothing about it.
If we should hold in favor of the power of the corporation to interfere in such case, — if the council may suppress every noise incident to the various kinds of business, then it would be within its power, at the instance of any individual who might be annoyed thereby, to stop the boil'er works, abolish the smith shops, suppress the church bells, and inaugurate an era of silence; No such power *142 exists. Private annoyances must be redressed in the civil courts, not by municipal interference.
Oscar T. Martin, for plaintiff in error.
A. F. Summers, city solicitor, for defendant in error.
The judgment of the common pleas, and the judgment of the police court are reversed at the costs of the defendant in error, and the cause will be remanded to the police court with instruction to that court to dismiss the prosecution at the costs of the defendant in error.